JUDITH E. BERNIER vs. STEPHEN A. BERNIER
(and a companion case[1]).

Dukes. May 7, 2007. - September 14, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Divorce and Separation,* Division of property, Alimony. *Corporation,* Close
corporation, Valuation. *Estoppel. Collateral Estoppel.*

In a judgment of divorce, in which the husband would receive ownership of S
    corporations (two supermarkets) he owned equally with the wife, and the
    wife would be required to relinquish all ownership in the businesses, the
    judge erred in adopting a valuation that "tax affected" the fair market value
    of the S corporations at the average corporate rate of a C corporation,
    especially where the parties were not arm's-length buyers and sellers but
    rather were fiduciaries entitled to equitable distribution of their marital as-
    sets, as application of the C corporation rate of taxation severely undervalued
    the value of the supermarkets while failing adequately to account for the loss
    of S corporation benefits to the wife; instead, the judge should have adopted
    a valuation that captured the tax benefit to the husband of receiving cash
    dividends that are not subject to dividend taxes [781-790]; further, where the
    husband planned to retain control of the S corporations after the divorce, the
    judge erred in applying "key man" and marketability discounts to the valua-
    tion and in rejecting a growth rate that accounted only for inflation [790-793];
    finally, the valuation should have incorporated an equalization of the fees
    paid to attorneys for the parties [798-799].
The judge in a divorce action did not abuse her discretion in the amount of
    alimony awarded to the wife, where the wife's election to maintain a money-
    losing horse farm was a personal decision concerning the postdivorce use of
    former marital property, and not one that the husband could be forced to
    finance. [793-796]
A Probate and Family Court judge erred in dismissing a complaint in equity
    filed by the wife in a divorce action, seeking an accounting and equalization
    of income from two supermarkets she jointly owned with the husband for a
    period of years subsequent to the stipulated-to date of reconciliation of ac-
    counts in the divorce action, where the issues raised in the equity complaint
    were not decided in the divorce action, and where the wife did not have a
    full and fair opportunity to air her claims, which she brought in a timely
    manner. [796-798]

[1]Judith E. Bernier vs. Stephen A. Bernier; Bernier's Market, Inc., doing busi-
ness as Cronig's State Road Market; Bernier's Up Island Market Inc., doing
business as Cronig's Up Island Market; and Colonial Drive Real Estate Corpora-
tion, doing business as Islander.

COMPLAINTS for divorce filed in the Dukes Division of the Probate and Family Court Department on June 12, 2000.

The cases were heard by *Randy J. Kaplan*, J.

CIVIL ACTION commenced in the Dukes Division of the Probate and Family Court Department on July 28, 2003.

A motion to dismiss was heard by *Randy J. Kaplan*, J.

After consolidation of the appeals in the Appeals Court, the Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*David L. Kelston (Theodore Tedeschi* with him) for Judith E. Bernier.

*Paul M. Kane* for Stephen A. Bernier.

MARSHALL, C.J. This appeal by Judith E. Bernier (wife) from decisions of a judge in the Probate and Family Court incident to her divorce from Stephen A. Bernier (husband) presents us with the novel question whether it is proper to discount the value of an S corporation, see 26 U.S.C. §§ 1361-1379 (2000), by "tax affecting" income at the rate applicable for C corporations, where one spouse will receive ownership of all shares of the S corporation after the divorce and the other will be required to relinquish all ownership in the business. See 26 U.S.C. §§ 311, 312 (2000). Also presented by the wife's appeal are whether the judge erred in discounting the fair market value of the S corporations at issue here by applying "key man" and "marketability" discounts; whether the amount of alimony awarded to the wife was proper; and whether the judge improperly dismissed the wife's equity complaint against the husband alleging misuse of marital assets.

On the issue of tax affecting, we conclude that the judge erred in adopting the valuation of the husband's expert witness that tax affected the fair market value of the parties' S corporations at the "average corporate rate," in the words of the husband's expert, of a C corporation.[2] As a preliminary matter, where valuation of assets occurs in the context of divorce, and where one of the par-

---

[2] As we discuss *infra*, the income of a C corporation is subject to income tax at both the corporate (or entity) level and the shareholder level on dividends, if any, paid to shareholders. In contrast, the income of an S corporation is not subject to Federal tax at the entity level, see note 14, *infra*, but is passed through and taxed to the shareholder when earned by the corporation, whether

ties will maintain, and the other be entirely divested of, ownership of a marital asset after divorce, the judge must take particular care to treat the parties not as arm's-length hypothetical buyers and sellers in a theoretical open market, but as fiduciaries entitled to equitable distribution of their marital assets. See G. L. c. 208, § 34.

Further, careful financial analysis tells us that applying the C corporation rate of taxation to an S corporation severely undervalues the fair market value of the S corporation by ignoring the tax benefits of the S corporation structure and failing to compensate the seller for the loss of those benefits. On the other hand, in the circumstances of this divorce action, we agree with a recent decision of the Delaware Court of Chancery that failure entirely to tax affect an S corporation artificially will inflate the value of the S corporation by overstating the rate of return that the retaining shareholder could hope to achieve. See *Delaware Open MRI Radiology Assocs.* v. *Kessler*, 898 A.2d 290, 327 (Del. Ct. Ch. 2006) (*Kessler*). Our review of the scant case law and the pertinent literature on the issue leads us to adopt generally the metric employed by the *Kessler* court, see *id.* at 328-330, described more fully *infra*, which most closely achieves the parties' stated intention in this case to divide the value of their S corporations equally, the outcome the judge also sought to achieve. We also conclude that, where the husband testified that he planned to retain control of the S corporations after the divorce, the judge erred in applying key man and marketability discounts, discounts that assume the possible sale of the asset.

On the issue of alimony, we hold that the judge did not err in awarding the wife an amount of alimony sufficient to meet her personal needs, as reflected in her financial statement, exclusive of losses she incurred in owning and operating a horse farm acquired by the parties during the marriage and given to the wife pursuant to the parties' stipulation and the judge's award in the

---

or not the corporation pays dividends. In the context of valuation of the stock of an S corporation, "tax affecting" is employed in what the parties refer to as the income approach to appraising the value of S corporation shares, by which the estimated future earnings of the corporation are discounted by imputed future tax burdens at the entity level, even though the S corporation pays no entity level earnings taxes. See *Gross* v. *Commissioner of Internal Revenue*, 272 F.3d 333, 344-347 (6th Cir. 2001), cert. denied, 537 U.S. 827 (2002) (*Gross*).

divorce action. See *Heins* v. *Ledis*, 422 Mass. 477, 482 (1996) (purpose of alimony is support and maintenance). Finally, we determine that the wife's equity complaint against the husband was not barred by principles of issue preclusion and res judicata and therefore should not have been dismissed. We affirm the portion of the third amended supplemental judgment in the divorce matter concerning alimony, vacate the portion of the third amended supplemental judgment concerning valuation of the parties' S corporations, and remand for further proceedings not inconsistent with this opinion. We vacate the judgment of dismissal in the wife's equity action, which we also remand for further proceedings not inconsistent with this opinion.

1. *Background.* The parties were married in Massachusetts in 1967. On June 12, 2000, the husband, then fifty-two years old, and the wife, fifty-four years old, filed cross complaints for divorce in the Dukes Division of the Probate and Family Court Department.[3] The record indicates, and the judge found, that initially the parties were of modest means. However, in 1986, after they moved from Billerica to Martha's Vineyard, their circumstances improved markedly. The engine of the parties' financial success was two supermarkets that were subsequently owned by two S corporations, of which the husband and wife each owned one-half.[4] During their marriage, the parties also acquired what the judge termed an "extensive" portfolio of residential, commercial, and undeveloped properties. Among these properties was a thirty-six acre plot of land in West Tisbury, which the parties purchased in 1996, and on which they constructed Rosewood Farm (horse farm), a horse breeding farm under the control and management of their company, Rosewood Farm, Inc.

After they filed for divorce but before trial, the parties voluntarily entered into numerous temporary stipulations governing their financial affairs during the pending proceedings. The stipulations gave the husband sole authority to operate and manage the supermarkets and similar authority for the wife to run the horse farm.

---

[3]Their two children were emancipated at the time the parties filed for divorce.

[4]The corporations were Bernier's Market, Inc., doing business as Cronig's State Road Market, and Bernier's Up Island Market, Inc., doing business as Cronig's Up Island Market. The supermarkets produced substantial yearly cash flow for their owners.

Further, the stipulations provided that certain business and personal expenses, and the parties' attorney's fees and costs, be paid from specified joint assets. Additionally, before trial, the parties agreed that all of their assets would be divided equally, and stipulated to the value of most of their assets, approximately $11 million. The parties were unable to reach agreement on two issues: the value of the supermarkets and the amount of alimony due to the wife. On February 27, 2002, a judge in the Probate and Family Court entered a judgment of divorce nisi, bifurcating the trial on the two remaining issues.

Between February and May, 2002, the judge heard eight days of testimony, which centered principally on the value of the supermarkets.[5] During the trial, each party presented the testimony of an expert witness on valuation: Mark Leicester prepared the wife's valuation, and Joel Horvitz prepared that of the husband.[6] Leicester and Horvitz were in broad agreement on key points. Specifically, both agreed that the buyer of the supermarket shares would seek an investment that would yield the buyer's required rate of return. They also agreed that the most accurate estimate of the supermarkets' value would be achieved by employing what both parties refer to as the "income" approach, taking the supermarkets' average adjusted income after expenses for a set number of years, divided by the appropriate capitalization rate.[7]

Despite their areas of agreement, however, the two experts arrived at vastly different appraisals of the supermarkets' fair market value. Leicester testified that the fair market value of the supermarkets was $16,391,000. Horvitz set the fair market value at $7,850,000.

The discrepancy in the experts' valuations was due to several

[5]The parties agreed to establish the valuation of the supermarkets as of December 31, 2000, the date of the last reconciliation of accounts prior to trial.

[6]At trial, neither party challenged the qualifications of the other's expert witness.

[7]We understand the term "income" approach to valuation, as used by the parties, to mean the same as the method also referred to as the "capitalization of income" approach, see *Dallas* v. *Commissioner*, 92 Tax. Ct. Mem Dec. (CCH) 313, 315 (2006), or the "capitalized economic income" method. For a discussion of these methods utilized for valuation, see generally S.P. Pratt, R.F. Reilly, & R.P. Schweihs, Valuing Small Businesses & Professional Practices (3d ed. 1998) at 236-237, 254-257.

factors, primarily Horvitz's application of tax affecting, as well as certain discounts to his calculations of fair market value[8] and Leicester's omission of those considerations. Specifically, Horvitz tax affected as if the S corporation were a C corporation, at what he termed the "average corporate rate" of thirty-five per cent. But see note 19, *infra*. He testified that tax affecting the S corporations at the C corporation rate was proper because, among other things, a person contemplating the purchase of an S corporation would factor into his probable rate of return the tax consequences of the purchase. Leicester, on the other hand, did not tax affect the supermarkets' income in his valuation because, as he testified, an S corporation, unlike a C corporation, does not pay taxes at the entity level, and because no sale of the business was contemplated.[9] Horvitz additionally discounted the fair market value of the supermarkets by applying a ten per cent "key man" discount to the adjusted net income of the supermarkets to account for the undisputed fact that the husband was the most important figure in the operation and management of the supermarkets.[10] He then applied an additional ten per cent discount to account for the "lack of marketability" of the S corporation as

---

[8]"Fair market value" is generally defined as the "price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts." *Gross, supra* at 344, quoting Treas. Reg. § 25.2512-1. See *United States* v. *Cartwright*, 411 U.S. 546, 551 (1973). See also C.P. Kindregan, Jr., & M.L. Inker, Family Law and Practice § 45:8, at 332-333 (3d ed. 2002) (discussing factors to consider in valuing closely held corporation). But see *Dallas* v. *Commissioner, supra* at 318 (distinguishing "fair value" — fair merger price that stockholder would receive — and "fair market value" — price hypothetical willing buyer would pay hypothetical willing seller, both having reasonable knowledge of all relevant facts and neither being under compulsion to buy or sell).

[9]Leicester testified that, in his opinion, the highest and best use of the supermarkets was as an S corporation. He also testified that the application of tax affecting to S corporations depended on the facts of each case and could not be established categorically. Horvitz, the husband's expert, testified that he did not "speculate" on the characteristics of a potential buyer, because in a divorce action he considered it appropriate to value the businesses as of a specific date only.

[10]Both experts agreed, and the judge found, that at the time of trial, the husband was the "whole show" for the supermarkets, the person "who makes it all happen." The judge accepted the parties' testimony that they contributed equally to the acquisition and maintenance of their marital estate from the date of their marriage in 1967 until the date of their separation in 2002.

a closely held business. Leicester maintained that, because the husband planned to maintain ownership and control of the supermarkets after the divorce, key man and marketability discounts should not apply.

On August 18, 2003, the judge entered a supplemental judgment, finding of facts, rationale, and conclusion of law on the valuation of the supermarkets. The judge rejected Leicester's valuation as "unreliable." Specifically, she faulted Leicester on the grounds that he improperly combined pretax and posttax data in establishing a capitalization rate, improperly applied a rate of growth to his valuation, omitted a marketability discount, and lacked experience valuing S corporations. The judge adopted substantially without change Horvitz's method of applying tax affecting and key man and marketability discounts to the supermarkets, and adopted his conclusion that the fair market value of the supermarkets on the relevant date, see note 5, *supra*, was $7,850,000. In concluding that the income of the parties' S corporations should be tax affected for valuation purposes, the judge cited *Gross* v. *Commissioner of Internal Revenue*, 272 F.3d 333 (6th Cir. 2001), cert. denied, 537 U.S. 827 (2002) (*Gross*) (affirming United States Tax Court judgment that it was proper to tax affect using zero per cent corporate tax rate, in context of valuing gift of S corporation stock).

On January 22, 2004, nunc pro tunc to October 6, 2003, the judge entered a third amended supplemental judgment, awarding the husband the option to purchase the wife's fifty per cent ownership interest in the supermarkets for $3,925,000 — one-half of the supermarkets' total value of $7,850,000 — and providing other relief.[11]

After the close of trial, and while the divorce proceedings were pending, the wife, individually and, in a derivative action, on behalf of the parties' business entities, filed a separate verified complaint in equity against the husband and the business entities.

[11]Previously, on August 26, 2003, nunc pro tunc to August 19, 2003, the judge had entered an amended supplemental judgment, and the wife had filed a number of postjudgment motions objecting to the division of assets and alimony award. On the parties' joint motion the judge issued the third amended supplemental judgment, in which the husband was also ordered to pay alimony in the amount of $8,448.57 per week from the date of the judgment until August 17, 2007, and $5,288.46 per week thereafter.

The wife sought fifty per cent of the supermarkets' net income from January 1, 2001, the date of the last reconciliation of the supermarkets' accounts, to February 2, 2004, the date the husband exercised his option to purchase the wife's fifty per cent ownership interest in the supermarkets.[12] Among other things, the wife alleged that the husband had taken the position at a corporate meeting in July, 2003, that he was entitled to all of the income from the supermarkets after the last reconciliation (December 31, 2000), and that he had failed to provide the wife with accountings and distributions as required under the temporary orders. After a hearing, the judge dismissed the wife's equity complaint with prejudice, holding that because the wife's claims should and could have been brought in the divorce action and were resolved by the divorce action, her equity claims were barred by issue preclusion and res judicata.[13] The wife's appeals from the judge's decisions in the divorce action and from the dismissal of her equity complaint were consolidated in the Appeals Court, and we transferred the case from the Appeals Court on our own motion.

2. *Tax affecting the valuation of S corporation shares.* The parties agree, as the judge found, that the "major difference" in the valuations of Horvitz and Leicester is Horvitz's use of tax affecting. To assess the propriety of the judge's adoption of Horvitz's

---

[12]Earlier, in November, 2002, the wife had filed a complaint for contempt against the husband, alleging that he had violated the temporary orders by failing to provide her with financial information concerning the supermarkets and by taking money from the supermarkets for purposes not sanctioned by the temporary orders. In September, 2003, the judge found the husband in contempt for (a) failing to provide monthly accounting of income generated from the rentals to Bernier Realty Trust from May 1, 2002, until November, 2002; (b) failing to deliver copies of weekly cash journals and accounts payable check registers and monthly reports generated by the supermarkets within forty-eight hours of the date the reports were generated; and (c) utilizing corporate assets and pledging the credit of the supermarkets to attempt to start a health food store. The husband was ordered to (a) provide an accounting to the wife for all monies taken for his personal benefit; (b) pay to the wife the sum of $7,500 for her attorney's fees; and (c) cease making any investments or otherwise utilizing assets of the supermarkets until the wife was paid in full for her share of the supermarkets.

[13]The judge reasoned that the wife's failure to raise her claims for equalization of the income of the supermarkets during the divorce proceedings barred her from raising the claims in a subsequent equity action, where the issue of equalization of income had been addressed in temporary orders pursuant to the parties' stipulations.

methodology of tax affecting, it is instructive to summarize the pertinent facts regarding corporate structure and taxation.

The husband and wife, as equal shareholders, elected that the supermarkets be taxed under the provisions of subchapter S of the Internal Revenue Code, 26 U.S.C. §§ 1361-1379. To elect S corporation status, the corporation and its shareholders must meet and maintain several requirements, including, as relevant here, that (1) the corporation may not have more than one hundred shareholders, and (2) only individuals, estates, or certain trusts may hold its shares. 26 U.S.C. § 1361(b). In other words, an S corporation may not have a traditional corporation (known as a "C corporation") as one of its shareholders. The primary advantage of an S corporation over a C corporation is that the S corporation is not Federally taxed at the corporate level,[14] but is "passed through" to the shareholders on a pro rata basis and taxed to the shareholders when earned by the corporation, whether or not the corporation pays dividends. Cf. 26 U.S.C. §§ 707-777 (2000) (taxation of partnerships); 26 U.S.C. § 1363 ("taxable income of an S corporation shall be computed in the same manner as in the case of an individual"). See note 2, *supra.* Net income from these entities is passed through to owners and taxed at the individual level in the year that it is earned. In contrast, the earnings from a C corporation are taxed twice: once at the corporate level, and then at the individual level as a tax on shareholder dividends, if any, paid by the C corporation. Thus, as we illustrate in the margin, S corporation shareholders enjoy the considerable benefit of avoiding the "double taxation" of corporate dividends that is the hallmark of the C corporation.[15]

To distinguish between S and C corporations, however, does

---

[14]Massachusetts has a nominal State tax on the income of S corporations at the entity level, about which there is no dispute. Both parties' experts included this State tax in their valuations.

[15]We demonstrate the cognizable tax benefit to S corporation shareholders by way of an example adapted from the opinion of the Delaware Court of Chancery in *Delaware Open MRI Radiology Assocs.* v. *Kessler*, 898 A.2d 290 (Del. Ct. Ch. 2006) *(Kessler).* Assume that a corporation generates one hundred dollars in net annual earnings. If it is organized as a C corporation, its earnings after tax would be sixty dollars, assuming, as is the usual custom, that the effective corporate tax rate is forty per cent. Then, assume that the entity distributes its posttax earnings to its shareholders in the form of a dividend. Applying the individual tax on dividends at the prevailing rate of fifteen per cent, the shareholder

little in itself to clarify the issue of valuation. To begin with, we must acknowledge that the valuation of an S corporation is an inexact science.[16] See, e.g., *Gross, supra* at 356 (Cohn, J., concurring in part and dissenting in part). Compounding the difficulty in the case of an S corporation is the question whether, and how, to account for tax consequences. The matter has bedeviled the professional appraisers' community for some time, and certainly was the source of some confusion at the time of the trial. See *id.* at 355 (Cohn, J., concurring in part and dissenting in part). See also *Kessler, supra* at 326 (valuation of S corporation by tax affecting has "elicited a fair amount of attention from judges, appraisers and academics"). While the Internal Revenue Service (IRS) appears to have endorsed the practice of tax affecting an S corporation in the manner that Horvitz followed, see *Gross, supra* at 353 (Cohn, J., concurring in part and dissenting in part), quoting IRS Valuation Guide for Income, Estate and Gift Taxes: Valuation Training for Appeals Officers[17] (in valuing S corporations, one

(assuming for the moment one single shareholder) would receive total posttax distributions of fifty-one dollars. Thus, the shareholder's effective tax rate after corporate income and dividend taxes would be forty-nine per cent. If the corporation were organized as an S corporation, its shareholder (again, assuming only one) would receive the entire one hundred dollars in earnings as distributions and be subject only to a shareholder-level tax. Thus, the shareholder would be responsible for paying taxes on the one hundred dollars at his or her individual tax rates, which will vary according to the shareholder's total net income. If we assume the individual tax rate to be forty per cent because the shareholder is in the highest marginal tax rate, the shareholder would pocket sixty dollars after tax if all earnings were distributed. The benefit is thus clear: the shareholder of the S corporation in this example ends up with sixty dollars, while the shareholder of the C corporation ends up with fifty-one dollars. See *Kessler, supra* at 329.

[16]As counsel for both parties agreed at oral argument, valuation of any closely held corporation is fraught with uncertainties, and thus difficult to accomplish with precision and consistency. There are several unknown variables present in valuing shares of a company that is not publicly traded and not immediately marketable. See C.P. Kindregan, Jr., & M.L. Inker, Family Law and Practice § 45:8, at 332 (3d ed. 2002), citing B.H. Goldberg, Valuation of Divorce Assets 74 (Supp. 1987) ("Valuations of closely held businesses are 'not an exact science, . . . especially one dealing in services and largely dependent upon the personalities and abilities of its principals' ").

[17]The judge in this case improperly relied on the IRS valuation guide as authority to justify the tax affecting advocated by Horvitz. See *Gross, supra* at 347, quoting IRS Valuation Guide for Income, Estate and Gift Taxes: Valuation Training for Appeals Officers ("This material was designed specifically by the IRS for training purposes only. Under no circumstances should the

"need only to adjust the earnings from the business to reflect estimated corporate income taxes that would have been payable had the Subchapter S election not been made"), both case law and professional scholarship have cast serious doubt on the validity of this practice.[18]

In this case, the debate over tax affecting played out in the diametrically opposed positions taken by the parties' experts. Would the hypothetical purchaser of the supermarkets at fair market value, as the wife's expert maintained, not factor any tax consequences at all into his analysis of the achievable rate of return on his investment, because an S corporation, as an entity, pays no taxes? Or, as the husband's expert asserted, would that purchaser tax affect at the C corporation tax rate,[19] because, in the judge's

---

contents be used or cited as authority for setting or sustaining a technical position").

[18]See, e.g., *Dallas* v. *Commissioner*, 92 Tax Ct. Mem. Dec. (CCH) 313, 318 (2006) (tax affecting earnings is not appropriate in valuing gift of stock to determine fair market value; distinguishing *Kessler* application of "fair value" approach); *Estate of Adams* v. *Commissioner*, 83 Tax Ct. Mem. Dec. (CCH) 1421, 1425 (2002), citing *Gross, supra* ("it is appropriate to use a zero corporate tax rate to estimate net cashflow when the stock being valued is stock of an S corporation"); *Estate of Heck* v. *Commissioner*, 83 Tax Ct. Mem. Dec. (CCH) 1181, 1188 n.7 (2002); *Wall* v. *Commissioner*, 81 Tax Ct. Mem. Dec. (CCH) 1425, 1432 n.19 (2001) (discussing undervaluation resulting from tax affecting and overvaluation resulting from failure to tax affect, and concluding, "[b]ecause [one expert's] methodology attributes no value to [the entity's] S corporation status, we believe it is likely to result in an undervaluation of [the entity's] stock").

See also Finkel, Is There An S Corporation Premium?, 4 Valuation Strategies 14, 16-17 (2001) (S corporation should not be tax affected if likely buyers are eligible S corporation shareholders); Fisher, The Sale of the Washington Redskins: Discounted Cash Flow Valuation of S Corporations, Treatment of Personal Taxes, and Implications for Litigation, 10 Stan. J. L. Bus. & Fin. 18 (2005); Hawkins & Paschall, A Gross Result in the *Gross* Case: All Your Prior S Corporation Valuations Are Invalid, 21 Bus. Valuation Rev. 6 (Mar. 2002) (if S election will not be lost, then "tax-affecting may not be the more appropriate valuation method to employ"); Raby & Raby, Tax Affecting — or Effecting — S Corporation Stock Valuations, 93 Tax Notes 1315 (2001) (inappropriate to tax affect earnings of S corporation assumed to continue as such).

[19]Throughout his testimony, Horvitz was notably imprecise in explaining his use of a thirty-five per cent tax rate. On direct examination, he said that the figure "represents the after-tax weighted average adjusted earnings in the hands of a new owner," while agreeing that S corporations pay no Federal tax at the entity level. On cross-examination, Horvitz testified both that the thirty-five per cent tax rate represents "the average corporate rate" and that the thirty-five per

words, "the value of an entity should not depend on whether the shareholders make the elections to be a C or S Corporation?" Or would an alternative to these two extremes better account for the value of the supermarkets in the circumstances of this case?

Valuation of a business is a question of fact. See *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 541 n.47 (1997). Thus, the standard is whether the judge's findings were clearly erroneous. See Mass R. Civ. P. 52 (a), as amended, 423 Mass. 1402 (1996). When the opinions of valuation experts differ, a judge may "accept one *reasonable* opinion and reject the other" (emphasis added). *Fechtor* v. *Fechtor*, 26 Mass. App. Ct. 859, 863 (1989). The judge may also "reject expert opinion altogether and arrive at a valuation on other evidence." *Id.* The judge may not, however, reach a valuation that is materially at odds with the totality of the circumstances or, in the case of divorcing spouses, at variance with the requirements of the equitable distribution statute. G. L. c. 208, § 34. See C.P. Kindregan, Jr., & M.L. Inker, Family Law and Practice § 45.8, at 334-335 (3d ed. 2002), citing *Fechtor* v. *Fechtor, supra* at 862-867.

In adopting Horvitz's approach over Leicester's in the matter of tax affecting, the judge invoked the *Gross* case to support her conclusions. That case does not, however, do the work to which the judge assigned it. At issue in *Gross* was the fair market value of certain gifts of restricted stock of an S corporation.[20] Declining to adopt the position set out in its own valuation guide, see note 17, *supra*, the IRS opposed the tax affecting of cash flows that the company had employed in estimating fair market value using the income approach. See *Gross, supra* at 354 (Cohn, J., concurring in part and dissenting in part). The United States Court of Appeals for the Sixth Circuit affirmed that the Tax Court had the discretion to adopt the testimony of the Commissioner of Internal

---

cent rate was for "personal tax." This discrepancy alone diminished the integrity of Horvitz's analysis. The judge was similarly vague. She stated only that Horvitz "applied an effective tax rate of thirty-five (35%) per cent to arrive at the after-tax weighted average adjusted earnings" and that "the Court believes that a deduction for taxes that will be owed must be made to either earnings or cash flow before an appropriate valuation can be made."

[20]The subject of taxation in *Gross* was the valuation of a gift of stock. The adverse parties were the government and the gift recipients of S corporation shares. The issue of equitable distribution was not present, as it is here. See *Gross, supra*.

Revenue's expert witness that tax affected the S corporation using a zero per cent corporate tax rate — effectively meaning no tax affect at all. *Id.* at 355 (Cohn, J., concurring in part and dissenting in part). The court was unpersuaded by the position taken by the taxpayer's expert, who tax affected at the corporate rate to account for the possibility that the corporation might lose its S corporation status in the future, because, the court noted, the record did not contain sufficient evidence that this was likely to happen. *Id.* at 353 (Cohn, J., concurring in part and dissenting in part). The court likewise rejected the argument that tax affecting at the C corporation rate was necessary to offset the fact that an S corporation must distribute enough funds to shareholders to pay their tax liability on its earnings; the court noted that the S corporation at issue had always distributed almost one hundred per cent of its net earnings and there was no evidence this practice would not continue. *Id.*

The judge in this case cited *Gross* for the proposition that "[t]ax affecting Subchapter S income for valuation purposes should be reflected in determining the 'cost of capital.' " However, the judge ignored the *Gross* court's application of a zero per cent corporate tax rate and instead adopted Horvitz's thirty-five per cent "average corporate tax rate."[21] See note 19, *supra*. We conclude there is no support in *Gross* for the judge's adoption of

---

[21]The judge stated in her findings that Horvitz distinguished the outcome of *Gross* on the ground that the issue in that case "was the value of a fractional, minority interest in an S Corporation that was to be valued for gift tax purpose[s]." She does not explain how that supposed distinction affects the determination of value here.

The judge also cited the IRS valuation guide to justify tax affecting. However, the IRS valuation guide cannot be cited as authority. See note 17, *supra*.

The judge's written "Rationale" provides no clearer window on her thinking, perhaps reflecting a confusion about whether corporate or individual taxation rates were being applied. See note 19, *supra*. The judge stated, "A buyer [of] either entity has to consider the tax consequences of the income generated. A shareholder of a C corporation only personally pays taxes on the dividend that [it] receive[s]. [It has] actually received the dividend and can utilize those monies to pay the resultant tax. . . . A shareholder of an S corporation pays taxes on [its] proportionate share of the company, whether or not [it] actually receive[s] the cash. If sufficient funds were not received by the shareholder then he would have to utilize personal funds to pay the taxes. When the S corporation distributes additional funds to the shareholders so that the tax can be paid [as was the testimony in this case] the working capital of the company is reduced, and the income available to distribute to the owners is also

Horvitz's figure, and moreover, the judge failed to offer a cogent explanation of her choice. See note 21, *supra*. The husband has cited no cases, nor have we found any, that apply the presumed thirty-five per cent rate of taxation of a C corporation to estimating the fair market value of an S corporation using the income approach.[22] We agree with the husband that the judge is free to credit the reasonable opinion of one expert over that of another. See *Kendall* v. *Selvaggio*, 413 Mass. 619, 620 (1992) (in reviewing valuation, court should "accept the judge's findings of fact as true unless they are clearly erroneous"); *Fechtor* v. *Fechtor, supra* at 863. However, even though the consensus on tax affecting was not entirely clear at the time of trial, and still remains subject to debate, the judge erred in adopting in all material respects Horvitz's valuation that tax affected at thirty-five per cent[23] when doing so was not reasonable, as it would clearly produce an arbitrary result: a significant undervaluation of the supermarkets. See *Fechtor* v. *Fechtor, supra*, citing *Caldwell* v. *Caldwell*, 17 Mass. App. Ct. 1032, 1033-1033 (1984).

The difficulty with the judge's position is framed cogently in the decision in *Kessler, supra. Kessler* concerned a closely held S corporation, where the dealings between the majority and minority shareholders were constrained by fiduciary considerations.[24] See *Donahue* v. *Rodd Electrotype Co. of New England, Inc.* 367 Mass. 578, 593 (1975), quoting *Cardullo* v. *Landau*, 329 Mass. 5, 8 (1952) ("we hold that stockholders in the close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another . . . [that standard of duty being defined as] the 'utmost good faith and loyalty' "). Here too, the property division between the husband and wife is constrained by fiduciary considerations. See G. L. c. 208, § 34. In *Kessler*, three of eight shareholders (Kessler

---

reduced. Therefore, the Court believes that a deduction for taxes that will be owed must be made to either earnings or cash flow before an appropriate valuation can be made."

[22]Subsequent to *Gross*, the United States Tax Court also decided in several cases that it was improper to tax affect an S corporation. See cases cited at note 18, *supra*.

[23]See note 19, *supra*.

[24]In *Kessler*, the Delaware court reached its determination noting the presence of both a Delaware "equitable entire fairness claim and a statutory appraisal claim." *Kessler, supra* at 310.

group) of a radiology practice operating as an S corporation wanted the majority shareholders (Broder group), with whom business relations had ruptured, to buy out their shares. Predictably, the value each side attached to the shares differed markedly. The expert for the Broder group treated the S corporation as a C corporation in his valuation, applying forty per cent as the tax rate to the business's earnings. The Kessler group's expert did not tax affect earnings at all. The judge found neither expert's testimony concerning tax treatment to be fair. "The problem with [the] approach of treating [the entity] as a C corporation is obvious. [The entity] is a very small entity. The record reveals no set of circumstances in which it is likely that [the entity] will convert to C corporation status. It is a highly profitable entity that generates and distributes income well in excess of the stockholder level taxes its stockholders must pay. The S corporation tax status is a highly valuable attribute to the shareholders of [the entity], given its profitability and the affluent status of its physician stockholders, who face top marginal tax rates." *Kessler, supra* at 326. Treating the enterprise effectively as a C corporation, the court held, failed to account for the comparative tax benefits of S corporation ownership — its signature feature — and therefore depressed the estimate of the business's fair value. *Id.* at 327. On the other hand, the judge in *Kessler* reasoned, not tax affecting at all was also unfair, because it would lead to a windfall for the minority sellers. "[Denying] the reality that each shareholder owes taxes on his proportional interest in [the business] would result in the [Kessler group] receiving a higher per share value from the court than it could ever have realized as a continuing shareholder. . . . This is a simple premise — no one should be willing to pay for more than the value of what will actually end up in her pocket." *Id.* at 328-329, citing Fisher, The Sale of the Washington Redskins: Discounted Cash Flow Valuation of S Corporations, Treatment of Personal Taxes, and Implications for Litigation, 10 Stan. J. L. Bus. & Fin. 18 (2005).

Having rejected the rationale and conclusions of both experts, the Delaware court proposed an alternate approach. This approach attempted to capture the tax benefit to the buyer of S corporation shares (the Broder group) of receiving cash dividends that are not subject to dividend taxes. *Id.* at 330. The court ob-

served that, as is the case here, the buyout was an "involuntary removal," *id.*, and not an arm's-length purchase. To calculate the effect of taxes on the buyers and the sellers in these circumstances, the judge asked: if the S corporation at issue were a C corporation, at what hypothetical tax rate could it be taxed and still leave to shareholders the same amount in their pockets as they would have if they held shares in an S corporation? In other words, the judge asked what the effective corporate tax rate would be for the S corporation shareholder, although the entity itself paid no corporate tax. Assuming a dividend tax rate of fifteen per cent and a personal income tax rate of forty per cent (the shareholders were wealthy physicians who paid individual taxes at the highest rate),[25] the court imputed a "pre-dividend" corporate tax rate of 29.4 per cent to the S corporation. *Id.*[26] The result was to leave the shareholder of an S corporation with the same amount of money in his or her pocket as the shareholder of a C corporation being taxed at a (fictitious) 29.4 per cent corporate tax rate. *Id.* Applying this rate to the earnings of the entity measures "with the greatest practicable precision the fair value of the . . . interest in the going concern value of" the business. *Id.*

The *Kessler* court's trenchant analysis allows us to see that, in this case, applying the presumed thirty-five per cent tax rate applicable to a C corporation to the valuation of the supermarkets

[25]The Delaware court emphasized, as do we, that a different analysis might apply if the profits of the S corporation were plowed back into the company instead of distributed, or if the shareholders were not individually taxed at the highest bracket. See *Kessler, supra* at 329 n.101.

[26]The Delaware court determined the 29.4 per cent figure by creating fictional percentages to represent Federal corporate tax at the entity level and dividend tax at the shareholder level, to arrive at the same figure that would be left in the pockets of shareholders of an S corporation after taxing one hundred dollars of earnings (i.e., sixty dollars resulting after taxing one hundred dollars of earnings at the rate of forty per cent as in our example, see note 15, *supra*). To derive this fictional figure, the court worked in reverse. To achieve a posttax income of sixty dollars (after corporate entity tax and dividend tax), the figure to tax would be $70.60 (fifteen per cent of $70.60 is $10.60, and subtracting the latter from the former arrives at sixty dollars). To arrive at $70.60 from the total one hundred dollars of earnings, the court subtracted 29.4 per cent, the appropriate fictional tax rate. Phrased differently, the court asked at what rate a C corporation would be taxed at the entity level to permit the shareholder to receive a distribution of sixty dollars (as he would from an S corporation) rather than the fifty-one dollars he would have received as a C corporation shareholder. That differential rate captures the benefit of ownership in the S corporation.

understated the value of the supermarkets, while failing adequately to account for the loss of S corporation benefits to the wife.[27] The result was particularly misplaced in this case in light of the uncontroverted evidence that the supermarkets would continue to operate as S corporations after the parties' divorce; that they would continue to be owned by one of the existing shareholders[28]; and that the supermarkets were profitable and would continue their historic practice of making cash distributions. We emphasize, moreover, that the valuation of the supermarkets was undertaken pursuant to G. L. c. 208, § 34, for purposes of equitable distribution in a divorce matter. Even though the judge did not have the benefit of the *Kessler* decision at the time she rendered her judgment, these circumstances alone should have prompted the judge to look past the all-or-nothing approach of the parties' experts and pay particular attention to the facts of this case over more abstract considerations.

We conclude that the metric employed by the *Kessler* court provides a fairer mechanism for accounting for the tax consequences of the transfer of ownership of the supermarkets from one spouse to the other in the circumstances of record. On remand on the issue of valuation, the judge is to employ the tax affecting approach adopted in *Kessler*.

3. *Discounts.* The parties' experts agreed that the husband's expertise was critical to the continued success of the supermarkets.

---

[27]The judge stated: "[The wife's expert's] position is that a Subchapter S corporation would be worth substantially more than a Subchapter C corporation to a buyer. This is premised on the notion that an S corporation has an ability to provide greater cash flow to the owner due to the single level of tax paid by the entity. The court does not agree with this argument. Owners of S corporations normally distribute funds to themselves, as additional compensation, in order to pay the taxes arising from the corporate profits." The judge apparently eschewed the common understanding that shareholders in S corporations benefit from not having to pay a tax at the entity level. The fact that the husband paid himself additional money to meet his tax burden only supports the proposition that he benefited from the entity's S corporation status.

[28]The husband testified that the supermarkets were not for sale at any price. The wife made clear that she was willing and able to purchase the husband's one-half share for $8 million. There was additional evidence at trial that two other supermarkets on Martha's Vineyard, each totaling 25,000 square feet of selling space (smaller than the supermarkets at issue), had recently sold for approximately $9 million each. There was evidence that a large supermarket chain had made an overture to the husband to purchase the supermarkets, and that the husband was not open to discussions.

On the assumption that after the divorce the supermarkets might be sold to a third party who would replace the husband at the helm of the supermarkets,[29] Horvitz (the husband's expert) discounted the value of the two supermarkets by ten per cent each for the "loss of [the husband]" as the "key man" and for the costs of sale (including broker's fees and advertising) of the supermarkets as closely held corporations. In evaluating the supermarkets, the judge adopted Horvitz's key man and marketability discounts. In the circumstances of this case, that was error.

It is appropriate to assess a key man discount when an individual's "continued services are critical to the financial success" of the business being valued and may be or will be lost. See *Commonwealth* v. *Levin*, 11 Mass. App. Ct. 482, 485 (1981) (defining term). See also Rev. Rul. 59-60, 1959-1 C.B. 237; *Estate of Feldmar* v. *Commissioner*, 56 Tax Ct. Mem. Dec. (CCH) 118, 130 (1988); *Nelson* v. *Nelson*, 411 N.W.2d 868, 871 (Minn. Ct. App. 1987). Here, however, given the husband's uncontradicted testimony that he would maintain total ownership and control of the supermarkets, it is beyond reason to conclude that the business's value should be reduced to account for loss of the man who is "the whole show." Indeed, the cases cited by the husband support rather than detract from our analysis. In *Estate of Feldmar* v. *Commissioner*, *supra*, the court adopted a key man discount because the "key man" in the complex insurance holding company at issue had in fact died; without him, the court reasoned, the company might have no value at all. In *Nelson* v. *Nelson*, *supra*, the court found a key man discount applicable where the heart of the business was the sale of the employee's unique engineering services; the key man and the business were literally inseparable. The husband's role in the supermarkets, in contrast, is that of chief executive; his services are critical but not unique or irreplaceable, and in any event, as we have previously noted, the husband was not likely to be "lost" to the enterprise. In the circumstances of this case, the judge should not have adopted a key man discount in valuing the supermarkets.[30]

[29]Horvitz testified that he applied the discounts because, "I don't have the luxury in a divorce case of knowing who the owner's going to be and what the person will be able to do" with the supermarkets.

[30]Even if the husband had full control of the supermarkets, of course, his

Similarly, a marketability discount "adjusts for a lack of liquidity in one's interest in [a closely-held corporation], on the theory that there is a limited supply of potential buyers for stock in a closely-held corporation." *Tierney* v. *John Hancock Mut. Life Ins. Co.*, 58 Mass. App. Ct. 571, 577 n.8 (2003), cert. denied, 541 U.S. 903 (2004), quoting *Lawson Mardon Wheaton, Inc.* v. *Smith*, 160 N.J. 383, 398-399 (1999). See *Balsamides* v. *Protameen Chems., Inc.*, 160 N.J. 352, 373 (1999). As Horvitz testified, and the judge found, a marketability discount is "the ability to convert the subject company to cash." This discount was not warranted in light of the husband's testimony negating any possibility of a sale. See note 28, *supra*. The subject companies will continue as going concerns and are not being converted to cash. "[N]either marketability nor a minority discount should be applied absent extraordinary circumstances . . . . Close corporations by their nature have less value to outsiders, but at the same time their value may be even greater to other shareholders who want to keep the business in the form of a close corporation." *Brown* v. *Brown*, 348 N.J. Super. 466, 474-476 (2002). Applying a marketability discount in light of the husband's intended, and presumed, acquisition of the supermarkets unfairly deflated their value.

One final issue raised by the wife is the matter of the rate of growth utilized in valuing the supermarkets. Horvitz used no growth rate in his valuation because he testified that doing so was a mere "guess" about the future. However, while he testified that the supermarkets "had a downward trend in sales over the last three years," he also admitted on cross-examination that the supermarkets' revenues were, in fact, growing, and that only the percentage of growth had been trending downward. Leicester testified that his valuation added a two and one-half per cent growth rate to account only for inflation. The judge "[did] not find that the application of a growth rate is appropriate in this matter." We disagree. We are persuaded that the judge abused her discretion by rejecting the two and one-half per cent growth rate advanced by Leicester where the uncontroverted record demon-

services could be lost due to illness or other catastrophe, to the detriment of the supermarkets' financial success. Leicester's valuation, as well as Horvitz's, took into account the risk that the businesses could potentially suffer in the event of the husband's incapacity or death. See C.P. Kindregan, Jr., & M.L. Inker, Family Law and Practice § 45:8, at 332-333 (3d ed. 2002).

strated that revenue growth had exceeded that amount in all relevant years, and there was no evidence that future growth would fall short of inflation.[31]

4. *Award of alimony.* The wife was awarded alimony in the pretax amount of $5,288.46 per week, or $275,000 per year (approximately $165,000 after taxes, assuming forty per cent total rate of taxation).[32] The judge also ordered the husband to pay to the wife as additional alimony the sum of $3,160.11 per week to cover the expenses of the horse farm, until he paid the wife in full for her interests in the supermarkets.[33] The wife claims that the alimony award must be vacated as inadequate to meet her demonstrated needs, because it fails to cover the costs associated with her postdivorce ownership and management of the horse farm, which had always been principally under her management and control, which had never made a profit, and which sustained yearly losses in excess of $600,000.[34] The wife also claims that the award leaves the parties "drastically unequal in terms of income" because the husband will have postdivorce income of almost $2 million yearly while she receives only $275,000 yearly. We decline to vacate the alimony award.

A judge has considerable discretion in fashioning an alimony award, on consideration of all the factors set forth in G. L. c. 208, § 34. See *Heins* v. *Ledis*, 422 Mass. 477, 480-481 (1996); *Drapek* v. *Drapek*, 399 Mass. 240, 243 (1987); *Rice* v. *Rice*, 372

---

[31]Leicester testified that revenues grew as follows: 10.3 per cent in 1997; 7.8 per cent in 1998; 7.1 per cent in 1999; and 3.2 per cent in 2000.

[32]Alimony was to terminate on the earliest of the wife's remarriage, the husband's death, or the wife's death.

[33]The husband was ordered to pay $8,448.57 per week in alimony to the wife until August, 2007, at which time alimony would be reduced to $5,288.46 per week, representing the amount necessary to meet the wife's needs exclusive of operating costs of the horse farm, which were factored into the initial, higher alimony award. Originally the court ordered that the husband be given the option to buy the wife's shares through five equal payments of $585,000 over five years, during which time he was to pay interest at the rate of six per cent. By order of the third supplemental judgment, the husband was permitted to buy the wife's ownership of the supermarkets with a single lump sum payment, while continuing to provide the wife with extra alimony until August, 2007.

[34]The judge found that the wife will receive assets from the property settlement that are adequate to provide her with sufficient income to meet the expenses of the horse farm if she continues to run it at a loss.

Mass. 398, 400 (1977); *Bianco* v. *Bianco*, 371 Mass. 420, 422 (1976). Our review of an alimony award made pursuant to § 34 is essentially a two-step analysis. "First, we examine the judge's findings to determine whether all relevant factors in § 34 were considered."[35] *Bowring* v. *Reid*, 399 Mass. 265, 267 (1987). The second part of our review is to determine whether the reasons for the judge's rulings are apparent in her findings and rulings. *Id.* If a judge has made findings consistent with her obligations under G. L. c. 208, § 34, indicating that she has fairly considered all factors relevant under § 34 and has not considered any irrelevant matter, her determinations as to alimony may not be reversed unless "plainly wrong or excessive." See *Ross* v. *Ross*, 385 Mass. 30, 37-38 (1982).

The judge's findings of fact show that she considered all of the factors under § 34 in reaching her conclusion.[36] Her determination that the alimony award should not be used as a postdivorce subsidy of the horse farm was also sound. "Alimony is an award for support and maintenance . . . ." *Heins* v. *Ledis*, *supra* at 482, quoting Inker, Alimony and Assignment of Property: The New Statutory Scheme in Massachusetts, 10 Suffolk U.L. Rev. 1, 11 (1975). See *Keller* v. *O'Brien*, 420 Mass. 820, 827 & n.13 (1995) (award of alimony is improper absent finding of financial need on part of recipient spouse); *Gottsegen* v. *Gottsegen*, 397 Mass. 617, 623 (1986) ("§ 34 does *not* alter the fundamental purpose of alimony: to provide economic support to the dependent spouse" [emphasis in original]). Alimony "has historically been based on the common law duty of the husband to support his wife. Property division, on the other hand, is based on the joint contribution of the spouses to the marital enterprise." *Heins* v. *Ledis*, *supra*, quoting Inker, *supra*. Neither the court nor the parties may "blur the distinction between alimony and property division." *Heins* v. *Ledis*, *supra*, quoting Inker, *supra*. "The

[35]General Laws c. 208, § 34, contains fourteen mandatory factors that the judge must consider, and four discretionary factors that the judge may consider.

[36]The parties did not submit in the record before us their statements of personal expenses. The wife testified that her personal expenses were $3,364.25 per week and that weekly expenses for the horse farm totaled $12,654.45. We credit the judge's findings on the matter of weekly expenses based on the representations the parties made at trial and the financial statements submitted during the trial.

standard of need is measured by the 'station' of the parties — by what is required to maintain a standard of living comparable to the one enjoyed during the marriage." *Grubert* v. *Grubert*, 20 Mass. App. Ct. 811, 819 (1985). See *Sampson* v. *Sampson*, 62 Mass. App. Ct. 366, 369 (2004) (same). There was no evidence that the money-losing horse farm was necessary to maintain the wife's "station" in life. The wife's election to maintain the horse farm is a personal decision concerning the postdivorce use of former marital property; the husband cannot be forced to finance that decision.

The wife relies on *Kelley* v. *Kelley*, 64 Mass. App. Ct. 733, 741 (2005), for the proposition that it is error to reduce an alimony award so that a husband may avoid "subsidiz[ing]" for the foreseeable future the wife's "avocation." This case is readily distinguishable. First, the *Kelley* decision addressed only modification of a judgment for alimony (based on the husband's request to eliminate support), rather than an original alimony award. Therefore, the standard of review was whether there had been a change of circumstances since the entry of the earlier judgment, not whether the wife was entitled to alimony to support her position of underemployment. See *id.* at 738-739. Second, if we are to extrapolate from the *Kelley* decision to comment on the actual award of alimony provided to the wife by the Probate and Family Court judge in that case, that award was designed to support the wife's ability to care for three children while working as an artist. The wife here, in contrast, was awarded an amount sufficient to meet her personal expenses without being required to seek any additional employment. Moreover, the judge found that the wife had skills in the management of horse breeding that would permit her to acquire "future capital, assets and income." To require that the husband in this case subsidize a venture that loses on the order of $600,000 per year, regardless whether the horse farm is a vocation or "avocation" for the wife, is a matter different from ordering support of an individual who, for reasons inapplicable here, may not be able to earn up to her full potential. The wife has failed to present persuasive evidence that her desire to continue to run the horse farm at a loss is integral to maintaining an "elaborate life-style." That choice cannot, as the wife urges, be analogized to awards properly designed to maintain a similar

standard of living to the marriage, such as allowing an individual to "socialize or entertain" or "purchase clothing" as in the past. See, e.g., *Goldman* v. *Goldman*, 28 Mass. App. Ct. 603, 608 (1990); *Grubert* v. *Grubert*, *supra* at 812. We cannot say that the judge's award was "plainly wrong or excessive."

5. *Complaint in equity.* The parties entered into stipulations for temporary orders during the divorce that provided, among other things, that both would continue to own the supermarkets and equally share their profits during the pendency of the divorce, as well as to account for certain monies from the supermarkets to be used for particular purposes, including their attorney's fees and costs. The net income of the supermarkets was equalized through the end of 2000, thus leaving "unequalized" income of some $3.6 million yearly for the period of more than three years, from January 1, 2001, to February 2, 2004 (post-2000 period), during which the wife continued to be a fifty per cent shareholder of the supermarkets. The wife appeals from the judge's dismissal of her complaint in equity, filed after the close of evidence but while the case was still pending, seeking an accounting and equalization of income for the post-2000 period. We conclude that the judge's actions in this case effectively deprived the wife of a reasonable opportunity to bring the issue of income equalization during the post-2000 period before the court at an appropriate juncture, and that the equity complaint was therefore wrongly dismissed.

A brief chronology is in order. The wife sought to introduce the matter of income equalization on several occasions. The first was through a contempt claim filed in November, 2002.[37] Then, on July 28, 2003, before the divorce or contempt judgments entered, the wife filed an equity complaint against the husband. The impetus for this complaint was the husband's assertion at a corporate meeting of the supermarkets on July 10, 2003, that the income of the supermarkets was entirely his. When it issued, the divorce judgment on the property division did not address equalization of income for the post-2000 period. In September, 2003, the wife moved postjudgment for equalization, to which she ap-

---

[37]The contempt action claimed that the husband had failed to provide monthly reports of the supermarkets, as stipulated; had withdrawn funds for personal use; had violated the automatic restraining order; and had caused her to incur a potential tax liability for S corporation income for 2002.

pended the complaint in equity.[38] The contempt judgment issued in September, 2003, and did not address the issue of income equalization for the post-2000 period.[39] On September 30, 2003, during a hearing on the wife's postjudgment motion for equalization, the judge suggested that the wife was entitled to a share of the income ("I don't think there's any dispute that she owned those shares") but nevertheless precluded the claim because the "issue was never presented to me." She noted that the wife's equity complaint was "potentially a remedy for that issue." In July, 2004, the judge dismissed the wife's equity action on the husband's motion to dismiss, giving two reasons for so ruling: first, that the pretrial stipulations of the parties did not specify any entitlement of the wife to equalization of income; and second, that the issue should have been raised and resolved during the pendency of the divorce action, and was therefore barred under the doctrine of claim preclusion.

The judge's actions created a "Catch-22" for the wife, whose various attempts to have the court address the issue of equalization for the post-2000 period were denied as either premature or waived. Before a claim will be barred on the ground of claim preclusion, it must be established that the claim was actually and necessarily decided in a prior action or that there was a full and fair opportunity to have done so that was not taken. See *Heacock* v. *Heacock*, 402 Mass. 21, 24 (1988); *Massachusetts Prop. Ins. Underwriting Ass'n* v. *Norrington*, 395 Mass. 751, 753 (1985); *Ratner* v. *Rockwood Sprinkler Co.*, 340 Mass. 773, 775 (1960). Here, the judge erred in concluding that the pretrial stipulations somehow canceled the need to consider equalization for the post-2000 period in her judgment. The stipulations were entered as

---

[38]When the divorce judgment entered and the husband did not voluntarily agree to the final reconciliation, the wife filed her motion to amend the judgment to provide for equalization of the supermarkets' net income from January 1, 2001, until the transfer of the wife's ownership to the husband. The wife claimed that she was charged for her "withdrawals" from the supermarkets over the years, while she was not given "credit — even against those charges — for her fifty per cent ownership of distributable income during the applicable period." The motion additionally noted that it could be rendered moot if the judge decided to rule on the contempt action.

[39]The judge did, however, find the husband in contempt for failing to render an accounting to the wife and for certain expenditures not provided in the temporary orders.

temporary orders to govern spending (e.g., salary, attorney's fees, and expenses) only until the divorce judgment entered.[40] The parties agreed in the stipulations that payments debited to the parties' accounts would be considered loans repayable on "the final division of [the] marital assets." The stipulations were not intended to divest the wife of her fifty per cent share in the supermarkets. If the stipulations respond to the wife's entitlement to income in any way, they weigh in the wife's favor, providing that "[t]he parties agree that neither will draw any funds from any of the corporations for their personal benefit, other than the weekly paycheck to [the husband], except as provided herein in their agreement." The stipulations clearly do not entitle the husband to full ownership of the income distribution.[41]

Second, it is clear that the judge's rulings did not provide the wife with a full and fair opportunity to air her claims, which the wife brought in a timely manner. The equity complaint was filed less than two weeks after the husband declared at a corporation meeting that he would henceforward treat the income from the supermarkets as entirely his own. The wife could not have known in advance of the divorce judgment that that judgment would not address equalization for the post-2000 period, a matter that was clearly set before the judge months before the judgment issued. Principles of res judicata and claim preclusion were inapplicable to the wife's complaint in equity.

In regard to equalization, we are also constrained to note one final issue concerning the parties' attorney's fees and costs. In the novel and complex circumstances of this case, we conclude that valuation of the markets and equal distribution of property are not issues that are easily separable. The parties' original stipulations provided that the supermarkets would advance the parties' attorney's fees, with the payments "debited to the party's account who has incurred those expenses," and that such payments would

---

[40]The stipulations controlled what money the parties could take from the supermarkets' income from January 1, 2001, until judgment entered (which occurred on August 18, 2003): the horse farm's expenses, $2,100 per week for the wife's basic living expenses, $5,000 per week as a salary for the husband, and various other expenses.

[41]Furthermore, as the wife notes, Federal law requires that S corporation distributions be made strictly based on stock ownership. 26 U.S.C. § 1361(b)(1)(D).

be considered loans repayable by each party on the "final division of [the] marital assets." The parties agreed to an equal division of the marital assets and the supermarkets. Each party has expended a considerable sum for legal representation toward the joint goal of valuing the supermarkets and dividing these assets. A final equalization of the supermarkets should incorporate the fees paid to attorneys for each party, and be treated so that each party is effectively debited with half of the attorney's fees. To fail to do so would leave the wife to pay her entire legal expenses out of her own pocket while the husband effectively would receive a windfall by simply moving money from one source under his control to another. We therefore conclude that the valuation of the supermarkets should be adjusted to take into account advances of legal fees for both parties since the December 31, 2000, reconciliation.

6. *Conclusion.* The portion of the third amended supplemental judgment in the divorce matter concerning alimony is affirmed. We vacate the portion of the third amended supplemental judgment concerning valuation of the parties' S corporations, and remand for further proceedings not inconsistent with this opinion concerning tax affecting, key man and marketability discounts, the application of a two and one-half per cent growth rate to account for inflation, and the equalization of attorney's fees. We vacate the judgment of dismissal in the wife's equity action, and remand for further proceedings not inconsistent with this opinion.[42]

*So ordered.*

---

[42]We appreciate that the valuation issues in this case were complex and that the judge did not have the benefit of the *Kessler* analysis in rendering her decision. We emphasize the judge's role in weighing the parties' necessarily adversary arguments to ensure that the final judgment reflects the statutory requirements of equitable distribution and, here, the parties' agreement to divide assets evenly between them. On remand, we leave to the judge's discretion whether to solicit additional briefs and testimony from the parties on the specific issues presented.