NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-12551

LAYNE C. CONNOR  vs.  WILLIAM P. BENEDICT.


Middlesex.     November 6, 2018. - March 7, 2019.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher, & Kafker, JJ.


Divorce and Separation, Alimony, Division of property.
    Marriage.



Complaint for divorce filed in the Middlesex Division of the Probate and Family Court Department on June 2, 2014.

The case was heard by Kevin R. Connelly, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.


Robert Clark for the husband.
Marc G. Bellerose for the wife.


LENK, J.  Layne C. Connor (wife) filed a complaint for divorce in June 2014 against William P. Benedict (husband), to whom she had been married for a little more than two years, and with whom she had lived for much of the prior twelve years. Following a trial, a judge of the Probate and Family Court

issued a judgment of divorce nisi that awarded general term alimony to the wife and, among other things, divided the marital estate such that fifty-five percent of the over-all assets were awarded to the husband and forty-five percent to the wife. Although the legal marriage lasted 2.25 years, for purposes of determining the amount of alimony pursuant to the Alimony Reform Act of 2011, St. 2011, c. 124, the judge considered the marriage to have been of slightly more than eight years' duration. In doing so, the judge took into account an approximately six-year period from 2005 to 2011, during which he found that the parties had lived together and had engaged in an economic marital partnership. The husband appealed, and we transferred the case to this court on our own motion.

The husband challenges the alimony award on two grounds. First, he claims that, as a matter of law, the wife was precluded from entering an economic marital partnership with him during much of the six-year period because she received alimony payments from her former spouse during that time. In the alternative, the husband claims that, even if the wife could have entered into an economic marital partnership, the judge did not make sufficient findings to support a determination that she had done so. The husband also challenges the division of the marital estate on the grounds that the judge selected the wrong valuation date; made an incorrect determination of the assets in

the marital estate; improperly assigned liabilities to the husband; and did not clarify the distribution of the retirement accounts.  We affirm.

1.  Background.  We summarize the judge's findings of fact, supplemented by undisputed facts in the record and reserving certain facts for later discussion.  See Pierce v. Pierce, 455 Mass. 286, 288 (2009).

a.  Early years (2000 to 2004).  When the parties met in August 2000, the wife owned a single-family house.  In July 2001, she sold that property and used the proceeds to make a down payment on a house in Maynard.  The parties began living together in the Maynard house in August 2001, along with the wife's minor son.[1]  At the time, the husband recently had filed for bankruptcy; his name did not appear on the deed or mortgage.  Nonetheless, the parties shared the mortgage payments, as well as the costs of utilities, groceries, and other household expenses.  At some point in 2001, the wife became disabled and unable to work.[2]  In 2003, she began receiving disability payments.

---

[1] Each party had a son from a prior marriage.  The husband's son did not live with the couple.

[2] Due to her disability, the wife remains incapable of working and is not expected to be able to work in the future.

b. <u>Australia (2004 to 2005)</u>. From March 2004 to September 2005, the wife relocated to Australia with her son in order to receive medical treatment. The parties arranged for the husband to live in the house in Maynard while he coordinated with a realtor to sell it. In September 2004, after the house had been sold, the husband moved to a rental townhouse in Shirley. Some of the proceeds from the sale were used to pay the wife's medical bills; $5,000 went to the husband for improvements he had made to the house while the wife was away; the wife received the remainder.

c. <u>Reunification (2005 to 2012)</u>. The wife returned to the United States in October 2005, when her Australian medical visa expired. In November 2005, the wife moved into the townhouse in Shirley and the parties resumed living together, sharing rent and utility expenses. The husband provided for the wife's health insurance through his employer's "domestic partner benefits program."

In November 2006, the parties jointly purchased a house in Townsend (marital home).[3] They each contributed at least $44,000

---

[3] The parties dispute the current value of the marital home and provided no evidence to support their varying estimates. The judge declined to make a finding as to the value of the house; he ordered the parties to sell the house and to share the sale proceeds equally.

to the down payment.[4]  They made substantial improvements to the house, including installing hardwood floors, retiling several rooms, and building a gymnasium in the basement.  The wife purchased most of the furniture, using credit cards; the husband paid at least some of the credit card bills.  The parties also bought additional household items, such as a dining room set, together.  Throughout the time they lived in the marital home, they shared the costs of the mortgage, utilities, and other household expenses.

In December 2008, the husband's employer terminated the wife's health insurance due to a change in company policy concerning "domestic partners."  In response, the wife obtained COBRA insurance at a monthly cost of $500, and the husband began contributing "slightly more" to the household expenses.

The wife's minor son lived with the parties in the marital home and became close to the husband.  When the husband's father passed away in 2011, the husband named the wife's son in the obituary as a grandson of the deceased.

---

[4] The judge found that the wife used $50,000 from the sale of her former house toward the down payment on the marital home. At another point in the decision, however, the judge noted that the wife contributed $44,000 toward the down payment on that house.  It is not clear whether the amount of $44,000 represents a portion of the funds from the sale of the wife's former house, or whether it represents an additional payment on the marital home.

d. <u>Receipt of alimony from prior spouse</u>. The wife and her prior spouse had divorced in 2001. After that divorce, the wife received regular child support and alimony payments. By 2006, the husband was "at least somewhat aware" of the alimony payments, which ceased in 2011.

e. <u>Marriage and separation (2012 to 2014)</u>. The parties were married on February 18, 2012. Thereafter, the wife again received health insurance through the husband's employer, at that point as his spouse.

The trial judge found that, throughout the course of the marriage (including at least the 6.33-year period in which they lived together immediately prior to their legal marriage), the parties enjoyed an "upper-middle-income lifestyle." They dined out two to three times per week, and traveled together several times per year to destinations such as Switzerland, the Bahamas, and California. The husband purchased diamond earrings, pendants, rings, and bracelets for the wife.

During 2013, however, the parties had a series of disagreements. The wife testified to incidents of abuse and harassment by the husband, and both parties suggested that the other had used intoxicating substances to excess. Ultimately, the judge found that the parties suffered from "a great deal of marital discord." The wife and her minor son left the marital

home on May 25, 2014, and began renting an apartment, while the husband and his adult son lived in the marital home.[5]

f. <u>Divorce</u>. The wife filed a complaint for divorce in the Probate and Family Court on June 2, 2014; the husband accepted service on June 13, 2014. In July 2014, the wife sought a number of temporary orders, and the motion judge, who was not the trial judge, ordered the husband to pay temporary alimony and all expenses related to the marital home. At trial, the husband and wife testified as the only witnesses, and submitted individual financial statements.

A judgment of divorce nisi issued on August 25, 2016. The trial judge determined that, at the time of trial, the wife was receiving disability payments, child support, and disability benefits for her child, totaling approximately $1,375 per week. The husband remained in good health and had been able to maintain his job at a large corporation, where he earned $2,832 per week,[6] as well as retirement, medical, and other benefits. The judge ordered the husband to maintain payments on the wife's

---

[5] The wife describes this situation as "essentially subsidizing the husband and his son's lifestyle while she simultaneously went into debt."

[6] Because of the commissions the husband received on complex financial products, his income fluctuated greatly from year to year. For instance, the husband's reported salaries during the eight years preceding the divorce ranged from lows of $124,623.50 in 2008 and $128,558.72 in 2015 to highs of $362,838.68 in 2011 and $305,153.51 in 2014.

health insurance and to maintain a life insurance policy in her name.  The judge also ordered the husband to pay alimony in the amount of $511 per week for a period of sixty-one months.  With respect to the division of property, the judge awarded fifty-five percent of the assets to the husband and forty-five percent to the wife, with the exception of the marital home, which was to be sold and the proceeds divided evenly.

2.  Discussion.  The husband contends that the judge erred in calculating the duration of the marriage for purposes of awarding alimony, and also that the judge erred in his division of the marital estate.

a.  Payment of alimony.  In determining the length of alimony payments to be awarded, the judge found that the parties had been legally married for 2.25 years.  See G. L. c. 208, § 48.  A judge, however, may "increase the length of the marriage if there is evidence that the parties' economic marital partnership began during their cohabitation period prior to the marriage."  See id.  Here, the judge determined that the parties had cohabited and engaged in an economic marital partnership for approximately 6.33 years, from November 2005, when they lived together in Shirley, to the date of their marriage in February 2012.  The judge therefore increased the duration of the

marriage to include that period,[7] and ordered payment of alimony for 5.148 years, the corresponding presumptive maximum duration under the statute.[8]

The husband argues that it was error to consider the 6.33 years as an economic marital partnership, because, as a matter of law, the wife was precluded from entering an economic marital partnership during the time when she was receiving alimony from a former spouse, and, even if she could have entered into an economic marital partnership, the judge's findings of fact are insufficient to support a determination that she had done so.

i. Durational limits on alimony. Alimony is "the payment of support from a spouse, who has the ability to pay, to a spouse in need of support for a reasonable length of time." See G. L. c. 208, § 48. "The purpose of alimony is to provide adequate support for a spouse who needs it." See Williams v. Massa, 431 Mass. 619, 634 (2000). General term alimony, in

---

[7] At trial, the parties disputed whether the period from August 2001 to February 2004, during which they cohabited in Maynard, also should qualify as a period of economic marital partnership. The judge declined to increase the length of the marriage to include that period of time. See note 14, infra.

[8] Combining the 2.25-year legal marriage and the 6.33-year economic marital partnership, the judge calculated the duration of the marriage to be 8.58 years. Pursuant to G. L. c. 208, § 49 (b), because the total duration of the marriage fell between five and ten years, the presumptive maximum duration of alimony payments is sixty percent of 8.58 years, i.e., 5.148 years.

particular, aims to support one spouse who has become "economically dependent" on the other.  See G. L. c. 208, § 48.

"A judge has broad discretion when awarding alimony under the statute."  Zaleski v. Zaleski, 469 Mass. 230, 235 (2014). Nonetheless, the "reasonable length of time" for which alimony payments may be ordered is constrained by the Alimony Reform Act of 2011, which sets presumptive durational limits on general term alimony.  See G. L. c. 208, § 49.  The limits are premised on the length of the parties' marriage; the longer the marriage, the longer the maximum permissible duration of alimony, up to a maximum cap.[9]  G. L. c. 208, § 49 (b).  See 2 C.P. Kindregan, Jr., M. McBrien, & P.A. Kindregan, Family Law and Practice § 53:1, at 1134 (4th ed. 2013) ("The longer a marriage lasts the more likely it is that there will be a closer economic union and dependence on support").  In order to determine the duration of an award of general term alimony, therefore, a judge first must calculate the length of the parties' marriage.  See G. L. c. 208, § 49 (b) (1)-(4); Duff-Kareores v. Kareores, 474 Mass. 528, 535 (2016).

---

[9] "The legislative history clearly shows that the broad discretion judges historically have had in making awards of alimony was not affected by the Alimony Reform Act of 2011, St. 2011, c. 124 . . . ."  See Zaleski v. Zaleski, 469 Mass. 230, 235 n.13 (2014).  Judges also may deviate from the presumptive maximum durations "in the interests of justice," upon a written finding.  See G. L. c. 208, § 49 (b).

General Law c. 208, § 48, defines the "[l]ength of the marriage" as "the number of months from the date of legal marriage to the date of service of a complaint or petition for divorce . . . duly filed in a court." The parties were married on February 18, 2012, and the husband accepted service of the complaint for divorce on June 13, 2014. There was no error in the judge's calculation that the parties had been married for 2.25 years.

As stated, the statute also provides that "the court may increase the length of the marriage if there is evidence that the parties' economic marital partnership began during their cohabitation period prior to the marriage." G. L. c. 208, § 48. A period of "cohabitation" and "economic marital partnership" "resembles, but is not equivalent to, a legal marriage." See Duff-Kareores, 474 Mass. at 534-535. During such a period, the parties act like a married couple, and form the financial dependencies, crystalized in marriage, for which alimony later may compensate.

"[I]n order to ascertain whether the parties were participating in an economic marital partnership," "a judge must consider the factors set forth in G. L. c. 208, § 49 (d) (1)." See Duff-Kareores, 474 Mass. at 535. These factors include, but are not limited to, economic dependence or interdependence, collaborative conduct in furtherance of a shared life, benefits

derived, and representations made or reputations acquired regarding the relationship.  See G. L. c. 208, § 49 (d) (1) (i)-(vi).  Here, the judge determined that the period from November 2005 to February 2012 constituted an economic marital partnership.

ii.  Receipt of alimony from third party.  The husband argues that, as a matter of law, the wife could not have entered into an economic marital partnership with him from 2005 to 2011, because she was receiving alimony payments from a previous marriage during that period.  He maintains that the word "marital" in the phrase "economic marital partnership" imbues the phrase with a requirement of monogamy, and permits either an alimony relationship with a former spouse or an economic marital partnership with a current partner, but not both.  He contends that to permit otherwise would be to endorse "financial infidelity," "financial bigamy," or "financial polyandry."

Our jurisprudence recognizes, however, that the receipt of alimony, without more, does not place an individual in an economic marital partnership with a former spouse.  While an economic marital partnership "resembles . . . a legal marriage," a court-ordered obligation to pay alimony does not.  See Duff-Kareores, 474 Mass. at 534-535, 537.

> "While it often may be the case that there is some measure
> of mutual dependence and benefit enjoyed by formerly
> married parties where one party is paying the other court-

ordered alimony, that alone would not convert court-ordered
payments into an economic marital partnership."

Id. at 537.  An economic marital partnership is premised, in
part, on the parties' conduct "in furtherance of their life
together" and their "community reputation . . . as a couple."
See id. at 534, quoting G. L. c. 208, § 49 (d) (1).  By
contrast, "[a] judgment requiring payment of alimony does not
contemplate a shared life," nor does it create a reputation of a
romantic pair within the community.  See Duff-Kareores, supra at
537.

There is no indication that, between 2005 and 2011, the
wife and her former spouse shared a primary residence, presented
themselves to the public as husband and wife, or planned their
schedules and vacations together.  Contrast Duff-Kareores, 474
Mass. at 537, 539 (once-married couple resumed economic marital
partnership after divorce).  The transfer of payments, itself,
does not create a marriage-like relationship, and it does
nothing to preclude the recipient from seeking out and entering
into an economic marital partnership.

Indeed, the Legislature expressly contemplated that an
individual who receives alimony payments may enter a new
romantic relationship, see G. L. c. 208, § 49 (a), (d), and the
formation of a new economic marital partnership is not
prohibited by the statute.  Rather, if an alimony recipient

cohabits and forms a "common household"[10] with a new partner for a period of at least three months, a former spouse's obligation to pay alimony may be "suspended, reduced or terminated."  See G. L. c. 208, § 49 (d).  Where an individual who receives alimony enters an economic marital partnership, therefore, it is the alimony -- not the economic marital partnership -- which may give way.  See id.  Cf. G. L. c. 208, § 49 (a) (remarriage terminates alimony).

Here, the former spouse's continued payment of alimony did not prevent the wife from becoming economically interdependent with the husband, nor did it diminish the extent to which the new pair functioned as a couple and invested in a shared future during the period from November 2005 to February 2012.[11]  It was these mutual actions on which the husband's obligation to pay alimony now rests, without regard to the burdens once borne by the former spouse.

---

[10] The factors delineated in G. L. c. 208, § 49 (d) (1), are used to determine both whether two individuals have engaged in a "common household" and whether they have entered into an "economic marital partnership."  See Duff-Kareores v. Kareores, 474 Mass. 528, 534 (2016).

[11] The husband is not disadvantaged by the wife having received alimony payments during the period of economic marital partnership.  If anything, the wife's receipt of alimony helped fund the husband and wife's common enterprises, including renovating, furnishing, and maintaining a home together.

The judge was aware that the wife had received alimony from her former spouse, a fact that appears repeatedly throughout his findings. In accordance with G. L. c. 208, § 49 (d) (1) (vi), the judge was permitted to consider this and "other relevant and material factors." Nothing in the record suggests that he neglected to do so.

iii. <u>Sufficiency of factual findings</u>. The husband contends that the evidence is insufficient to support a determination that the parties cohabited and entered an economic marital partnership. We do not agree.

The judge found that the parties cohabited between October 2005 and February 2012; during that time, they lived together in Shirley and Townsend. As to their economic marital partnership, the judge properly considered the factors set forth in G. L. c. 208, § 49 (d) (1). With respect to economic interdependence, the judge found that the wife had become disabled and relied on the husband's health insurance during this period. The wife also relied, at least in part, on the husband's salary, as she was unable to work. In furtherance of building a life together, the parties shared in the purchase of a house in 2006, the cost of the mortgage, and the work required to perform renovations. During the same period, the husband repeatedly represented his

wife to his employer as his "domestic partner."[12]  Moreover, the husband held out the wife's son as his own in a 2011 obituary. The judge determined that "[t]he parties acted as a married couple in all respects."[13]

The judge's factual findings, supported by the record, also support his conclusion that the parties engaged in an economic marital partnership from November 2005 to February 2012.[14] Accordingly, the judge did not abuse his discretion in including the entire seventy-six month period in his calculation of the duration of the marriage.

---

[12] The husband's employer defined "domestic partners" as "two adults of the same or opposite sex who are in an ongoing and committed spouse-like relationship.  They reside together and are jointly responsible for each other's welfare and financial obligations."

[13] The husband argues, "Functionally, the parties' financial transactions were undistinguishable from similar transactions engaged in by unrelated roommates, and the parties' romantic involvement did nothing to alter their financial arrangements." We do not agree.  It is the confluence of economic interdependence, contemplation of a shared life, and reputation or representation as a couple which suggest a marriage-like economic marital partnership, pursuant to G. L. c. 208, § 49 (d) (1).

[14] To the extent that the judge also made findings that the parties engaged in an economic marital partnership from August 2001 to February 2004, he nonetheless retained discretion not to extend the length of the marriage to include this period. See G. L. c. 208, § 48 ("the court may increase the length of the marriage").  Because the wife explicitly waives this issue on appeal, we need not address it further.  See Popp v. Popp, 477 Mass. 1022, 1023 n.1 (2017) (waiving claim of error in judge's decision not to include specific period in length of marriage).

b.  Division of assets.  The husband argues further that the judge made several errors in dividing the parties' assets: (i) selecting an improper date of valuation of the marital estate; (ii) not properly defining the marital estate; (iii) assigning some of the wife's liabilities to the husband; and (iv) not clarifying the method of distribution of the retirement accounts.  Evaluating each in turn, we ascertain no error.

i.  Valuation date.  The husband contends that the judge erred by valuing the parties' marital assets based upon their then most recent financial statements, that were filed at trial on March 14, 2016, rather than valuing the assets as of June 2014, when the parties first separated, or upon the issuance of temporary orders of support in July 2014.

The determination of the appropriate valuation date is left to the discretion of the trial judge.  See Savides v. Savides, 400 Mass. 250, 252-253 (1987) (no abuse of discretion where judge used date of separation as valuation date); Moriarty v. Stone, 41 Mass. App. Ct. 151, 154 (1996) (no abuse of discretion where judge used date of trial as valuation date).  See also Davidson v. Davidson, 19 Mass. App. Ct. 364, 370 n.9 (1985) (determination of date is "best left to a case-by-case analysis").  Except where "warranted by the circumstances of a

particular case," however, the valuation date typically is the date of trial.  See Moriarty, supra.

Only two years passed between the date of separation and the date of trial.  Contrast Savides, 400 Mass. at 250-253 (trial took place approximately ten years after separation, and value of marital estate had increased significantly due to husband's exclusive contributions).  This case is not one in which either party obtained significant assets following the separation, distinct from accounts they had maintained during the marriage, such that the inclusion of those assets in the valuation would be rendered "contrary to the marital partnership concept on which [G. L. c. 208, § 34,] is founded."  Contrast Davidson, 19 Mass. App. Ct. at 370-376 (part of trust and expectancy under will not subject to property division where it was obtained after divorce).[15]  It was not an abuse of discretion for the judge to decide upon the date of trial as the date of valuation in the circumstances here.

ii.  Defining the marital estate.  The husband argues that the judge did not properly "define the marital estate" because he did not indicate which assets were acquired during the

_____

[15] To the contrary, the husband argues only that he continued to contribute to his retirement account and to pay household expenses, including the mortgage -- all of which were obligations existing during the period of the marriage or ordered by the court as temporary payments during the course of the divorce proceedings.

marriage, and because his division did not flow rationally from the parties' contributions to the marital estate.

As to the assets included in the marital estate, a judge is not limited to dividing assets acquired during the period of the marriage. See G. L. c. 208, § 34 (permitting division of "all or any part of the estate of the other"). A judge may divide "all property to which a party holds title, however acquired."[16] See Pfannenstiehl v. Pfannenstiehl, 475 Mass. 105, 110 (2016). See also Rice v. Rice, 372 Mass. 398, 400-401 (1977) (permitting assignment of property "whenever and however acquired"). This includes acquisitions made outside the period of the legal marriage or a period of marital economic partnership. See, e.g., Brower v. Brower, 61 Mass. App. Ct. 216, 218 (2004) (dividing assets acquired during period of cohabitation before legal marriage); Moriarty, 41 Mass. App. Ct. at 156 (permitting division of "the pension, retirement and other benefits accrued prior to the marriage"). The assets considered in this case included the marital home, financial accounts, vehicles, jewelry, retirement accounts, and personal property. As the parties "held title" to each, it was not improper for the judge

---

[16] There is no requirement, as the husband would have it, that the judge delineate "which assets were acquired during the marriage and which were not."

to consider any of these assets, regardless of when they were acquired.

General Laws c. 208, § 34, sets forth the factors which a judge must consider in dividing the parties' assets.  These include

> "the length of the marriage, the conduct of the parties during the marriage, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties, the opportunity of each for future acquisition of capital assets and income, and the amount and duration of alimony, if any, awarded . . . .  The court may also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates and the contribution of each of the parties as a homemaker to the family unit."

G. L. c. 208, § 34.  Trial judges retain "broad discretion" in weighing and balancing the factors described in G. L. c. 208, § 34.  See Kittredge v. Kittredge, 441 Mass. 28, 43 (2004).  See also Adams v. Adams, 459 Mass. 361, 372-373 (2011), S.C., 466 Mass. 1015 (2013).

In reviewing a trial judge's division of property, we conduct a two-step analysis.  See Bernier v. Bernier, 449 Mass. 774, 794 (2007).  First, "[w]e review the judge's findings to determine whether he [or she] considered all the relevant factors under [G. L. c. 208, § 34,] and no irrelevant factors."  See Baccanti v. Morton, 434 Mass. 787, 790 (2001).  Second, if the judge has done so, we will not reverse a judgment unless it

is "plainly wrong and excessive" (citations omitted).  See
Bernier, supra; Baccanti, supra at 793.

Contrary to the husband's position, "[t]he judge did make
findings as to these [assets]; he simply did not make the
findings sought by the husband."  See Baccanti, 434 Mass.
at 791.  The judge meticulously defined each of the assets
within the marital estate, tracking them over the period from
2001 through 2014.  After "fixing the nature and value of the
property" pursuant to G. L. c. 208, § 34, he explicitly
considered the requirements of the statute; he took into account
that the husband "contributed significantly more to the
acquisition of marital assets," and weighed that against the
wife's "health problems and lack of employability," as well as
his determination that the "parties contributed equally to the
marriage."  The judge decided that a division of assets favoring
the husband, fifty-five percent to forty-five percent, was
appropriate, but that the marital home should be divided evenly
in recognition that the parties had "contributed equally" to its
purchase and maintenance.  We cannot say that, having considered
the appropriate factors, the judge was "plainly wrong and
excessive" in his distribution of the parties' assets.  See
Bernier, 449 Mass. at 794; Baccanti, supra at 793.

iii.  Liabilities.  The husband maintains that the judge
erred in allocating a portion of the wife's "post-separation

consumer debt" to the husband.  The husband relies on Rule 411(a) of the Supplemental Rules of the Probate and Family Court, Massachusetts Rules of Court, at 815-816 (LexisNexis 2018), which establishes an "automatic restraining order" on both parties after one party files a complaint for divorce.[17] The rule admonishes that

> "[n]either party shall incur any further debts that would burden the credit of the other party, including but not limited to further borrowing against any credit line secured by the marital residence or unreasonably using credit cards or cash advances against credit or bank cards."

See Rule 411(a)(2) of the Supplemental Rules of the Probate and Family Court, supra at 816.

Subsequent to the separation, the wife purchased furniture on credit for the apartment in which she and her son were living.  The wife appears to have used her own credit cards for

---

[17] As to the "restraining order," the rule requires:

"Neither party shall sell, transfer, encumber, conceal, assign, remove or in any way dispose of any property, real or personal, belonging to or acquired by, either party, except:  (a) as required for reasonable expenses of living; (b) in the ordinary and usual course of business; (c) in the ordinary and usual course of investing; (d) for payment of reasonable attorney's fees and costs in connection with the action; (e) written agreement of both parties; or (f) by order of the court."

Rule 411(a) of the Supplemental Rules of the Probate and Family Court, Massachusetts Rules of Court, at 815 (LexisNexis 2018). The use of funds to purchase furniture satisfies the first exception, "as required for reasonable expenses of living."

the purchases, and there is no indication that the credit cards were in the husband's name, or that the debt encumbered the marital home. As such, the wife does not appear to have incurred "any further debts that would burden the credit of" the husband. Id. Moreover, the wife's purchase of furniture was not unreasonable. After the separation, the husband retained use of the marital home and the furnishings therein; the wife and her son moved into an apartment and required furniture of their own. The judge was aware of the debt the wife incurred, and considering the purpose for which the furniture was purchased, the judge allocated liabilities such that the wife was responsible for fifty-five percent of the debt and the husband was responsible for the remainder. There was no error in so doing. The "ultimate goal of G. L. c. 208, § 34," is "an equitable, rather than an equal, division of property." Adlakha v. Adlakha, 65 Mass. App. Ct. 860, 864 (2006), quoting Williams, 431 Mass. at 626.

iv. Retirement accounts. The judge ordered that "[t]he parties' retirement assets shall be divided between the parties, such that Wife receives [forty-five percent] of the total value in the accounts and Husband receives [fifty-five percent]." The husband contends that the distribution ordered was impermissibly vague with respect to the date of segregation, the effect of market gains or losses prior to the date the account is divided,

and the means by which to divide the accounts. He argues that, because a qualified domestic relations order (QDRO) was not issued, the division of the retirement accounts could constitute "early distribution" that would trigger a tax penalty.

A QDRO is an appropriate method by which to facilitate the distribution of child support, alimony, or marital property rights. See, e.g., Silverman v. Spiro, 438 Mass. 725, 736 (2003). The parties concede that a QDRO would resolve any tax concerns here. At oral argument, in response to a question whether a QDRO from the Probate and Family Court would be the appropriate resolution to the tax concerns, counsel for the husband responded, "It very easily would be, and I think that's really more of a housekeeping matter than anything else." Counsel for the wife represented that there "is an unequivocal agreement that a QDRO has to be done." Nothing in the judgment nisi or anything in this opinion precludes the parties from returning to the Probate and Family Court to seek such an order.

As to the husband's other concerns, as discussed, the valuation date for the parties' assets -- including the retirement accounts -- was set as March 14, 2016, the second day of trial. The only open question is how to account for fair market adjustments. The husband argues that the judge neglected to "specify whether the wife's portion would be subject to market gains or losses" after the valuation date. This judgment

does not preclude the parties from returning to the Probate and Family Court to pursue a QDRO, or from seeking clarification on the issue of how to account for market adjustments.[18]

Judgment affirmed.

---

[18] The wife seeks attorney's fees and double costs, on the ground that the husband's arguments are frivolous. "We are hesitant to deem an appeal frivolous and grant sanctions except in egregious cases." Symmons v. O'Keeffe, 419 Mass. 288, 303 (1995). Because we do not determine that the law was sufficiently well settled, such that "there [could] be no reasonable expectation of a reversal," we decline to allow the wife's request (citation omitted). See id.