NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

22-P-829                                        Appeals Court

        AYCA CELIKKOL GAZELLE  vs.  GUY SCOTT GAZELLE.


                        No. 22-P-829.

        Plymouth.     May 2, 2023. – June 26, 2023.

            Present:  Milkey, Walsh, & Smyth, JJ.


Divorce and Separation, Alimony, Division of property, Amendment
    of judgment.  Exchange Rate.  Real Property, Appraisal
    report.  Appraisal.



        Complaint for divorce filed in the Plymouth Division of the
Probate and Family Court Department on July 25, 2013.

        The case was heard by Kevin R. Connelly, J., and a motion
to amend the judgment was also heard by him.


        Viktor A. Theiss (Patrice E. Morse also present) for the
wife.
        David H. Lee (Kimberley J. Joyce also present) for the
husband.


        MILKEY, J.  The parties divorced after a lengthy marriage.

Trial commenced in the Probate and Family Court on October 3,

2017, and continued over eighteen nonconsecutive days until

December 18, 2018.  On December 29, 2020, the judge issued

findings and rulings, and a judgment of divorce nisi entered. As is pertinent to this appeal, the judge sought to divide the marital estate equally between the parties, and he ordered the husband to pay a specified amount of alimony. Complicating both the division of assets and the setting of alimony was the fact that much of the marital estate consisted of real estate holdings in Turkey. At the center of the dispute were eleven condominium units located in the Etiler neighborhood of Istanbul that the wife inherited or purchased from her family. The judge assigned these assets (Etiler assets) to the wife, as she had requested. On appeal, the wife challenges the currency exchange rates that the judge applied to the Etiler assets in order to convert their value (and corresponding rental income) from Turkish lira into United States dollars (U.S. dollars). Specifically, the wife claims error in the fact that the judge applied exchange rates from 2016 or 2017, instead of at the time judgment entered in 2020. According to the wife, the value of the lira had plummeted in the three-plus years after the beginning of the trial, and that, as a result, the judge ended up giving her significantly less than one-half of the marital estate that he intended that she receive. For related reasons, she argues that the judge set her alimony too low and that, going forward, her alimony should be adjusted for any changes in the exchange rate. The wife made these arguments in a motion to

amend the judgment, which the judge denied on August 19, 2021. In this consolidated appeal, we affirm.

Background. The parties disputed the value of the Etiler assets at trial, and each side put forward an expert on how much the properties were worth. The dueling experts presented appraisal reports, both completed in 2016, as to the market value of the Etiler assets in Turkish lira. The judge found the reports deeply flawed, and he concluded that both experts had skewed their appraisals in favor of their clients. Unable to choose between them, the judge split the difference between the appraisals for those condominium units covered by both reports. The judge accepted the husband's assigned value for the two condominium units that the wife declined to have appraised.[1] The wife does not challenge the methodology employed by the judge to place a dollar value on the Etiler assets, except with respect to the exchange rates that he chose. We turn to review in some detail how that issue arose at trial.

In October of 2017, in the early days of trial, the parties stipulated as to what the exchange rate had been on twenty-two

---

[1] After she filed her complaint for divorce, the wife transferred two of the condominium units to her daughter from a previous marriage. The wife did not have those units appraised, because she maintained that they were not part of the marital estate. The judge rejected this argument.

specific dates from 2007 to 2017.[2]  The most recent date covered by the stipulation was October 23, 2017.  Although the value of the Turkish lira had declined significantly over the previous decade, it appeared to have been relatively stable during the year preceding the start of the trial (at least based on the limited information presented in the stipulation).  That stability may explain the scant attention that the parties paid to the exchange rate in the early phases of the trial.

Over the course of the intermittent fourteen-month trial, the value of the Turkish lira began to plummet against the U.S. dollar.  This was concerning to the wife who had requested that the Etiler assets be assigned to her.[3]  Accordingly, on November 14, 2018, the fifteenth day of trial, the wife moved to have the judge take judicial notice of updated exchange rates.[4]  The judge

---

[2] The current litigation commenced in July of 2013.  Why the parties saw fit to provide exchange rates going all the way back to 2007 is not readily apparent.  Whatever the explanation, the stipulation generally included the exchange rates for two dates per calendar year from 2007 to 2017, with those dates falling at the beginning of January and July.

[3] The falling lira meant that the Etiler assets would be worth less in U.S. dollars if their value in Turkish lira remained the same.

[4] The wife first asked the husband to stipulate to updated exchange rates.  When he refused, she assembled updated figures in the form of a chalk that she requested that the judge accept.

denied that motion but indicated that he might revisit the exchange rate issue at a later date.

In his findings and rulings issued on December 29, 2020, the judge did not use the wife's updated exchange rates. Instead, a close reading of those findings and rulings reveals that he did the following. First, he took the values of the Etiler assets set forth in each of the two 2016 appraisal reports as stated in Turkish lira and converted them into U.S. dollars. He did this by using the exchange rates in effect on, or closest in time to, the specific valuation dates included in the respective reports.[5] This required the judge to take judicial notice of those exchange rates, because the specific dates at issue were not among those included in the stipulation that the parties had submitted. Having in this manner determined the value that each party effectively ascribed to the Etiler assets in U.S. dollars based on his or her expert's appraisal report, the judge then split the difference between these two sets of figures.[6] The resulting total value he placed on the Etiler assets was $4,082,591.92.

---

[5] The judge noted that he otherwise was trying to value the marital estate as of October 2017, the start of trial. As noted, the parties had stipulated as to what the exchange rate was on October 23, 2017, and the judge utilized that rate in determining, for example, the value of a family debt owed to the wife.

As mentioned, the wife filed a motion to amend the judgment of divorce nisi that requested that the judge recalculate how much the Etiler assets were worth in U.S. dollars using an updated exchange rate. Specifically, the wife asked the judge to use the exchange rate from the date of judgment, which at that point was approximately one-half of what it had been at the start of trial. If he had done this, the wife maintains, instead of her having to pay the husband $1,070,999.12 to compensate for her receiving the Etiler assets, the husband would have to pay her $217,687.28. The judge denied that motion.

Discussion. 1. Division of marital estate. In many respects, the issues raised by this case are quite ordinary. In most divorces, the marital estate will include real estate, or other assets, whose value can fluctuate dramatically over time due to routine market forces. As a result, the trial judge often is called upon to select the appropriate point in time that such property should be valued. Typically, the dispute is over whether to value the assets at the time of trial, or at an earlier date such as when the parties separated. See, e.g., Connor v. Benedict, 481 Mass. 567, 576 (2019), and cases cited.

---

[6] As discussed above, the judge used only the husband's valuation for two of the condominium units because the wife declined to have those units appraised. See note 1, supra.

"The determination of the appropriate valuation date is left to the discretion of the trial judge." Id. See Savides v. Savides, 400 Mass. 250, 253 (1987) (judge has "broad discretion" to select valuation date of marital estate). "Except where 'warranted by the circumstances of a particular case,' however, the valuation date typically is the date of trial." Connor, supra, quoting Moriarty v. Stone, 41 Mass. App. Ct. 151, 154 (1996).

Several aspects of the case before us make this different from the routine scenario. For one thing, the trial took over fourteen months to conclude.[7] This meant that "the date of trial" was not a single point in time, but a lengthy period in which the value of the assets may have changed significantly. For another, because the assets in dispute were foreign, their value in U.S. dollars was linked to the fluctuating currency exchange rate (an issue discussed at length infra). Moreover, as the trial judge himself implicitly recognized, exchange rates are precisely the type of information that can be ascertained by judicial notice; they are not dependent on trial evidence put forward by the parties. See Verveine Corp. v. Strathmore Ins. Co., 489 Mass. 534, 536 n.5 (2022), quoting Commonwealth v.

---

[7] The reason for this extended time frame is not entirely clear, although the parties stated at oral argument that part of the delay was driven by the unavailability of foreign witnesses.

Green, 408 Mass. 48, 50 n.2 (1990) (proper to take judicial notice where information is "subject of generalized knowledge readily ascertainable from authoritative sources").[8]  Relatedly, because the determination of the relevant exchange rates could be decoupled from the trial record, the judge faced the opportunity to place a value on the Etiler assets not just at the time of trial, but right up until the date that judgment entered (which, after all, was the point in time that the marital estate was divided).  In effect, the wife seeks to pose the following question to us:  in determining how much the marital estate being divided was worth, why should the judge not make use of readily available, up-to-the-minute data, especially where, as here, a lengthy amount of time had passed?

There is some superficial appeal to the wife's math-based arguments.  However, the force of those arguments evaporates under scrutiny.  That is because the wife relies on a fundamentally flawed factual premise:  namely, that changes in

---

[8] Other jurisdictions have uniformly ruled that courts can take judicial notice of foreign currency exchange rates.  See, e.g., Nature's Plus Nordic A/S v. Natural Organics, Inc., 78 F. Supp. 3d 556, 558 (E.D.N.Y. 2015) (taking judicial notice of foreign currency exchange rate); Royatex Ltd. v. Daughan, 551 A.2d 454, 455 (Me. 1988) ("foreign currency rate of exchange is a proper subject of judicial notice").  For a useful discussion of specific sources that courts can use to take judicial notice of foreign exchange rates, see USGen New England, Inc. v. TransCanada Pipelines, Ltd. (In re USGen New England, Inc.), 429 B.R. 437, 493-494 (Bankr. D. Md. 2010), and cases cited.

the actual value of a foreign asset can be determined based solely on changes in the exchange rate. To be sure, the value of a foreign asset in U.S. dollars is, by definition, the product of multiplying the nominal value of the asset in the local currency by the exchange rate. Therefore, if one assumes that the value of the asset in the local currency stays constant over time, it does follow -- as the wife asserts -- that the value of the asset in U.S. dollars will move in lock step with the fluctuating exchange rate. But the assumption that the nominal value of the asset in the local currency will have stayed constant during the relevant period is hardly self-evident, and it therefore needs to be supported by evidence. For example, it could well be that inflationary pressures in the country where the asset is located were causing increases in the nominal value of that asset in the local currency so as to at least partially offset a declining exchange rate when the value is converted into U.S. dollars.[9] This is a matter of simple arithmetic. The key point is that one cannot determine how the

---

[9] In fact, there are reasons to expect that a country whose currency is falling will be experiencing higher inflation. That is because it appears to be generally accepted among economists that exchange rates and relative inflation rates are inversely related, albeit not in a simple way. See, e.g., J. Madura, International Financial Management 112-114 (2015) (addressing inverse relationship between these rates, while noting that other factors will affect exchange rate). Our opinion does not depend on there being any such causal relationship.

value of a foreign asset in U.S. dollars may be changing over time solely by looking at changes in the exchange rate.

With this background in mind, we turn back to the case before us. As already noted, we agree with the wife insofar as she argues that the judge could have taken judicial notice of the fact that the exchange rate declined significantly during and after the trial. See Verveine Corp., 489 Mass. at 536 n.5. Nevertheless, we discern no error in the manner through which the judge placed a U.S. dollar value on the Etiler assets. The judge had discretion to choose the valuation date, and there was nothing unreasonable in the judge's looking to the dates on which the parties' experts completed their respective appraisals or in relying on the exchange rates in effect on those dates.[10] See Connor, 481 Mass. at 576-577.

The remaining question is whether the judge abused his discretion in denying the wife's two requests to calculate the

---

[10] The wife does not argue that the judge's assigning a value to the Etiler assets in U.S. dollars at the time each expert conducted his appraisal was inconsistent with the judge's defined mission of trying to value the estate as of the start of trial. Of course, it is possible that the dollar value of these assets changed between the dates of the appraisals in 2016 and October 2017. However, the practical reality that judges must work with evidence that already might be somewhat stale is hardly unique to this case. In any event, for the reasons already discussed, it cannot be determined that the value of the Etiler assets in U.S. dollars dropped between 2016 and 2017 solely by looking at changes to the exchange rate.

value of the Etiler assets by applying updated exchange rates. In making her requests, the wife made no showing that the nominal value of those assets had stayed constant in the intervening years.[11]  In other words, the wife presented only part of the picture.  Having not addressed how the value of the Etiler assets in Turkish lira may have changed during the relevant time period, the wife is unable to demonstrate that she in fact received less than one-half of the value of the marital estate in U.S. dollars.[12]

---

[11] The extended length of the interim period does not in the end assist the wife, because it stands to reason that the more time that goes by, the less likely it is that the value of the Etiler assets stayed the same.  Additionally, we note that data available from respected sources suggest that during the relevant time period, Turkey in fact was experiencing inflation that was significantly higher than that which was occurring in the United States.  See International Monetary Fund, Inflation rate, average consumer prices (2023), available at: https://www.imf.org/external/datamapper/PCPIPCH@WEO/OEMDCCf. According to such sources, the inflation rate in Turkey remains extraordinarily high, dramatically higher than what it is in the United States.  We do not rely on such data in our analysis and therefore have no cause to resolve whether comparative inflation rates are a proper subject of judicial notice.  See Sweeney v. Sweeney, 135 N.E.3d 1189, 1196 (Ohio Ct. App. 2019) ("court may take judicial notice of past [consumer price index] rates because they are generally known and not subject to dispute"). Nor do we mean to suggest that, were we to take judicial notice of relative inflation rates, we then would have a refined sense of whether rising nominal values in the Turkish real estate market would fully offset a declining exchange rate in converting the value of Turkish assets into U.S. dollars.  We claim no such aptitude.  For present purposes, the key issue is not what we know, but what we do not know.

[12] We additionally note that the wife could have pursued other obvious means of addressing the risk that the declining

One additional point about the division of assets warrants comment. Even to the extent that the wife might be correct that the value of the Etiler assets in U.S. dollars dropped significantly during the period between the end of trial and entry of judgment, it still would not be clear that the delay had any actual economic impact on her. Had judgment entered sooner, the marital estate would have been divided in the same manner, and any decrease in value of the Etiler assets still presumably would have fallen on the wife.[13]

2. Setting of alimony. The wife separately argues that the judge's reliance on outdated exchange rates had the effect of overstating the rental income she received from the Etiler assets, which in turn reduced the amount of the alimony that she was due. This argument fails for the same reasons as set forth above: while the exchange rate in fact does appear to have fallen significantly during the three-plus years at issue, we do

_____

exchange rate might reduce the value of the Etiler assets so as to leave her with less than one-half of the marital estate. For example, she could have requested that these assets be sold and the proceeds divided, something that the judge ordered with respect to certain of the other assets the couple owned elsewhere in Turkey. Alternatively, she could have requested that the Etiler assets be assigned to the husband. The wife tellingly did not pursue such options.

[13] Nothing in the record suggests that the wife would have sold the Etiler assets if the judgment of divorce nisi had entered earlier.

not know whether there was an offsetting increase in the nominal rental income that the Etiler assets generated.[14]  On the current record, the wife has not shown that the judge abused his discretion in declining to recalculate alimony using an updated exchange rate.[15]

3.  <u>Periodic adjustments to alimony</u>.  In her motion to amend the judgment of divorce nisi, the wife requested that the judge modify the alimony order so that once per quarter going forward, the amount of alimony due her would be "trued up" based on any changes in the exchange rate.  In other words, the wife was looking to have the amount of alimony adjusted to account for the fluctuating exchange rate through periodic adjustments.

---

[14] We acknowledge that the wife also receives a Turkish pension, which was part of the calculus in setting the alimony payments.  If that pension generates payments in a fixed amount, then a decrease in the exchange rate would indeed reduce the value of those payments in U.S. dollars.  However, the record before us does not indicate whether the amount of the pension payments is in fact fixed or instead includes, for instance, a cost of living adjustment.  Moreover, in any event, the wife's pension payments amount to a negligible portion of her income ($87 per week, which is approximately four percent of her total weekly income).

[15] Unlike the division of assets, the setting of alimony can be revisited through a complaint for modification based on a showing of materially changed circumstances.  See G. L. c. 208, § 49 (<u>e</u>).  Our ruling today is not intended to preclude the wife from seeking to prove in that context that the value of her income from the Etiler assets has dropped significantly.  She would need to present more than a naked change in the exchange rate to do so.

The judge denied this request and the wife now asks us to order that such a system be implemented.

The wife maintains that the arrangement she proposed is supported by Stanton-Abbott v. Stanton-Abbott, 372 Mass. 814, 816 (1977) (contrasting "application of a contingent or variable clause of a judgment to events as they occur, with the modification of a judgment").  The husband counters by arguing, based on more recent case law, that the wife's proposal would amount to a presumptively invalid self-modifying order that is warranted only in "special case[s]."  Young v. Young, 478 Mass. 1, 9 (2017), quoting Stanton-Abbott, supra at 817.[16]  For the reasons set forth above, looking solely to the fluctuating exchange rate paints an incomplete picture of whether the amount of alimony should be adjusted.  Whatever else can be said about the propriety of the type of automatic alimony adjustments that the wife proposes, we conclude that she has not justified how her proposal would be warranted here.

---

[16] The husband also points out that at trial, the wife was seeking a fixed amount of alimony and that she did not raise her argument about automatic adjustments until her postjudgment motion.  Although his argument that she thereby waived the issue has significant force, we choose to pass over this issue to reach the merits.

Conclusion.  We affirm the judgment of divorce nisi and the order denying the wife's motion to amend that judgment.[17]

So ordered.

---

[17] We deny the husband's request that we order the wife to pay his appellate costs and attorney's fees.  Although we find the wife's arguments unpersuasive, they are not frivolous.  See Marabello v. Boston Bark Corp., 463 Mass. 394, 400 (2012).